STATE OF TENNESSEE ex rel.

*v.*

SOUTHERN BELL TELEPHONE & TELEGRAPH COMPANY et al.

(*Nashville,* December Term, 1958.)

Opinion filed September 1, 1958.

Rehearing Denied December 12, 1958.

208

GEORGE F. McCANLESS, Attorney General, JACK WILSON, JAMES M. GLASGOW, Assistant Attorneys General and O. L. PEELER, for appellant.

W. W. KENNERLY, Knoxville, GEORGE T. LEWIS, JR., and WM. A. SANDS, Memphis, W. D. SPEARS, Chattanooga, A. A. KELLY, South Pittsburg, WESLEY P. FLATT, JR., Cookeville, J. O. BASS, ROBERT H. JENNINGS, C. G. BLACKARD, Nashville, and C. A. CAMERON, Cookeville, for appellees.

NEIL, CHIEF JUSTICE, and TOMLINSON, JUSTICE, dissented.

Mr. Justice Prewitt delivered the opinion of the Court.

The State, through its Commissioner of Highways has appealed from the Chancery Court of Davidson County, which upheld the validity and constitutionality of Chapter 170, Public Acts of 1957.

This Act provides for the State to reimburse utilities for the relocation of their facilities located on publicly owned rights of way when necessary due to the construction of interstate highways, and for the reimbursement of utilities for the relocation of utility facilities located on publicly owned rights of way when necessary due to the construction of any highway project which is built with Federal-aid funds, provided that the utility shows hardship to the extent that its financial structure is impaired, or its rates are increased as a result of bearing the cost of relocation, and in the event of disagreement between the Commissioner of Highways and any utility, as to whether the utility is entitled to reimbursement, under Sections 1 and 2 certain controversies must be submitted to arbitration.

The Commissioner attacked the constitutionality of this Act by filing a bill for a declaratory judgment seeking a declaration as to his rights, duties, and interests therein. The public act is alleged to be unconstitutional, violating Article II, Section 31, which forbids the use of the State's credit to or in aid of corporations and others; Article XI, Section 8, which prohibits unreasonable legislative classifications, laws favoring individuals and laws granting rights, immunities, privileges, or exemptions; Article I, Section 17, which prohibits suits against the State; and Article I, Section 20, which prevents the impairment of

contracts. The bill, as amended, also charges, that the Act is void for indefiniteness.

The suit was brought against the Southern Bell Telephone and Telegraph Company, which answered the bill. Numerous private corporations, individuals, municipalities and cooperatives were allowed to intervene. All filed demurrers and the company was granted leave to withdraw its answer and file a demurrer.

The trial court sustained the demurrers except as to the right of the Commissioner to institute the suit and held that Chapter 170, does not violate Article II, Section 31 of the State Constitution, and that the expenditures therein provided for are for a public purpose. It is insisted on behalf of the State that the effect of said Chapter 170 is to pledge the State's credit to, or in aid of persons, corporations and municipalities. In the case now before us we find the poles and other facilities on the public highway without charge and holding a mere privilege for this use.

The test of the legislation is whether it comes within the prohibitory language and intent of Article II, Section 31.

It will be noted that in Article II, Section 31, the Constitution expressly prohibits the giving or lending of the State's credit to, and in aid, not only of persons, corporations but municipalities as well.

Now, with this situation in mind this statute directing the expenditures of State funds to reimburse utilities for adjusting or removing their facilities from publicly owned right of way so that a State highway may be improved is

primarily for the benefit of subscribers of utilities or their stockholders, and is neither a State nor a public purpose.

█ It has been generally held that these utilities are required to remove their facilities from publicly owned rights of way where necessary to improve State highways, at their own expense. 52 Am.Jur. 64, Telegraph and Telephones, Sections 34, 28, 33, 37, 50; *Nashville, C. & St. L. Ry. v. Middle Fork Obion Drainage District,* 149 Tenn 490, 261 S.W. 975; *Southern Bell Tel. & Tel. Co. v. State ex rel. Ervin, Fla.,* 75 So.2d 796; *Southern Bell Tel. & Tel. Co. v. Commonwealth,* Ky., 266 S.W. 2d 308; *State of Tennessee v. United States,* 6 Cir., 256 F. 2d 244.

█ Article II, Section 29, of our Constitution is permissive under certain conditions while Section 31 is prohibitory. The test of Article II, Section 29, is whether the expenditure of public funds is for a public purpose. *McConnell v. City of Lebanon,* 203 Tenn. 498, 314 S.W.2d 12.

█ Under Article II, Section 31, the expenditure must be for a State purpose, which function the state performs for its general public, agencies and instrumentalities of the State for the accomplishment of a State purpose under State control; and the State must have the "* * * right of use * * *" of the property upon which the fund is expended. *Bedford County Hospital v. Browning,* 189 Tenn. 227, 225 S.W.2d 41, 44; *Baker v. Hickman County,* 164 Tenn. 294, 47 S.W.2d 1090; *Mulkey v. Quillian,* 213 Ga. 507, 100 S.E.2d 268.

█ The use of State credit for reimbursing utilities for removing their facilities from publicly owned right of way fails to serve a State purpose and is not for a public purpose. *Mulkey v. Quillian, supra.*

In *Southern Bell Tel. & Tel. Co. v. Commonwealth,* Ky. 1954, 266 S.W.2d 308, 310, the Court said:

"We think, fairly and reasonably construed, the removal and relocation of the poles and lines at appellant's expense may be justified under the specific provisions of the grant. The term 'so as not to obstruct the same' unquestionably relates to the obstruction of improvement, construction, and reconstruction of the state's highways as well as obstruction of travel upon completed highways. * * *

"If construed as requiring removal and relocation at the expense of the state, the franchise was in violation of Article II, sec. 33, of our Third Constitution, which was carried over into Section 177 of our present constitution, and provided:

" 'The credit of this Commonwealth shall not be given or loaned in aid of any person, association, municipality, or corporation.' "

The fact that the Legislature of this State has enacted a law which was not present in the Kentucky case authorizing such expenditures of public monies neither adds to, nor detracts from the force of the Kentucky decision.

If the Legislature is without authority under the Constitution to enact a law, the situation is the same as though there were no attempted enactment. Since the Constitution forbids the State from giving, or lending its credit "* * * to or in aid of any person, association, company, corporation or municipality," it is immaterial whether there is an attempt to have public monies paid out under the guise of legislative sanction.

We think that the basic test under this Section of our Constitution is whether the expenditure is for a State purpose. In the present case the primary purpose served by the expenditure is for the convenience and benefit of the utilities, the purpose cannot be public. In this connection see *Mulkey v. Quillian, supra.*

In *Bedford County Hospital v. Browning, supra,* this Court said, referring to Article II, Section 31;

"The obvious purpose of this Section of our Constitution was to prevent the State from using its *credit as a gratuity or donation to any person, corporation, or municipality.* * * * This grant does not constitute a gratuity or donation of State credit, as under the terms of the Act itself this constitutes performance of public duties and with no right to reap *individual profit.*

The Court states three reasons in concluding that the State Hospital Act did not violate Article II, Section 31, as follows:

"1. That the Act is for the accomplishment of not only a public but a State purpose as well.

"2. That the hospitals become the agencies and instrumentalities of the State for the accomplishment of such State purposes under State control, regulation and supervision.

"3. That the objection that the sovereign has no title to the institutions is met by the proposition that it will continue to have the use of the hospitals for the benefit of the people of the entire State."

In the Bedford County Hospital case the Court pointed out with reference to Article II, Sections 29 and 31 that

the Sections are different in purposes, in effect and in wording.

The case of *Oswego & S. R. v. State,* 226 N.Y. 351, 124 N.E. 8, is not in point. The whole basis of Justice Cardozo's opinion is that the Legislature may enact Acts when equity demands. The facts in the Oswego case showed that equity did demand that the state step in and do equity. We have no question of equity in the present case. The user of the defendants was only permissive.

▉ Certain factual situations were set out in the bill which must be taken as admitted on demurrer, which among other things, appears that the Telephone Company owns and operates a vast communication system for profit in the State of Tennessee, and a part of its facilities, including poles, wires, underground conduits, and other equipment are installed in, upon and under publicly owned rights of way under Section 65-2105 T.C.A. The public rights of way have been acquired at an enormous cost to the citizens and taxpayers of the State, and the Telephone Company, as well as other privately and publicly owned utilities, have used and occupied such rights of way without cost, or expense to them.

The bill charges that in order to participate in the interstate highway program, it was necessary for the State to appropriate and raise large sums of money, necessitating the enactment of. Chapter 264, Public Acts of 1957, authorizing the State Funding Board to issue bonds in the amount not exceeding $30,000,000; that the department has estimated that the cost of relocating utility facilities in connection with interstate highway projects in Tennessee will amount to $15,370,000, which is more than one half of the amount which the Legislature

authorized the State to borrow for highway purposes under said Chapter 264, Public Acts of 1957.

█ We think the Commissioner of Highways had full authority to institute this suit. *Cummings v. Beeler,* 189 Tenn. 151, 223 S.W.2d 913.

The Court being of the opinion that Chapter 170, Public Acts of 1957 offends and violates Article II, Section 31, of the Constitution of Tennessee, it is not necessary for us to discuss or decide other serious questions raised by the Satte on this appeal.

It results that the decree of the Chancellor will be reversed and the cause remanded to the Chancery Court of Davidson County with directions to enter such orders and decrees as may be necessary in the enforcement of this opinion.

BURNETT and SWEPSTON, JUSTICES, concurring.

TOMLINSON, JUSTICE, dissenting.

NEIL, CHIEF JUSTICE, not participating.

On Petition to Rehear

PREWITT, JUSTICE.

Since the opinion heretofore filed on September 1, 1958, was adopted by a majority of the Court, Justices Burnett and Swepston concurring, with Justice Tomlinson dissenting, and Chief Justice Neil not participating, the cause was set down for reargument on December 1, 1958, in which rehearing the Chief Justice participated.

Now, since said opinion was filed another State has spoken on the subject, to-wit, New Mexico, Pacific, in an opinion dated November 14, 1958, *State Highway Com-*

*mission of New Mexico v. Southern Union Gas Co.*, N.M., 332 P.2d 1007, the opinion having been written by Justice Shillinglaw, of that Court, which opinion was unanimous and in which they quote extensively from our opinion heretofore filed September 1, 1958. That Court struck down a similar statute as the one involved in this cause as being offensive to the Constitution of New Mexico.

We quote from tht opinion:

"We think that the basic test under this Section of our Constitution is whether the expenditure is for a State purpose. In the present case the primary purpose served by the expenditure is for the convenience and benefit of the utilities, the purpose cannot be public."

And again we quote:

"In conclusion, we would answer the main argument of the appellee that relocation of these utilities is a public governmental function by stating that the construction of highways is unquestionably a public governmental function but that we disagree as to relocation of utility facilities. Highways are constructed by the state on state-owned rights-of-way for the use of the public. The Southern Union Gas Company, in laying its gas lines, is acting solely for the benefit of the utility. The line is the property of the utility and to be used solely by it, neither the state nor the public having any right to use these lines. The Southern Union Gas Company is not a subordinate governmental agency nor is it fulfilling a governmental function although it is serving a highly useful purpose in the great American free enterprise tradition by furnishing for profit an essential commodity to the people of this state."

We further quote from the New Mexico case:

"In reply to the appellee's contention that the legislature can change the common law to provide for future payment of utility relocation costs, it is beyond question that the common law is subject to change by statute. That such change may not offend the constitution is equally true. Public policy of this state is determined by the legislature but such declarations of policy are restricted by the limitations of our constitution. *Flaska v. State,* 51 N.M. 13, 177 P.2d 174."

The majority of this Court adheres to our former opinion delivered on September 1, 1958, in which we held said Chapter 170, Public Acts of 1957 unconstitutional.

The petitions to rehear, after having been duly heard and considered by the Court, are overruled.

BURNETT and SWEPSTON, JUSTICES, concurring.

NEIL, CHIEF JUSTICE, and TOMLINSON, JUSTICE, dissenting.

SWEPSTON, JUSTICE.

I concur in the result of the majority opinion for the following reasons.

The removal and relocation of the facilities of privately owned so-called public utilities is not a proper cost to the State as the construction of a highway, such as is the removal of natural objects consisting of rock, soil, trees, etc.; to the contrary, such facilities have all been placed there with full knowledge that the owners may be required at any time in the future to relocate them and at their own expense; such has uniformly been done up to the present.

The only reason suggested as a justification for the Legislative Act in question is the asserted impact of the so-called "crash program" for constructing an Interstate Highway with Federal and State funds.

Conceding that for the accomplishment of the final objective it will require the expenditure by some utilities extraordinarily large sums, nevertheless as I understand it, this will be done over a period of as much as thirteen years.

Whatever the time, however, the condition is ony a difference in degree of cost rather than a change in nature of the respective obligations of the State and the utility to each other. It is asserted that no benefit accrues to the utility from the removal and relocation. I am not prophetic enough either to agree or disagree with that statement; but the same assertion could have been made in the past with reference to any relocations. Again it is asserted that no benefit will accrue from reimbursement under the statute. With that I can not agree; it can hardly be said that being relieved of the cost of this legal obligation would not be a benefit.

For these reasons the statute does not serve a public purpose.

If by its fiat the Legislature can authorize the expenditure of these large sums on properties in which the State has no financial interest and no control other than the regulatory powers over any corporation "affected with a public interest", then I see no way to restrain the Legislature within the limits of Art. II, Sec. 31 of our State Constitution, whenever it may decide to do equity according to its own conception.

MR. JUSTICE BURNETT requests that I state that he fully concurs herein.

NEIL, CHIEF JUSTICE (dissenting).

The writer of this dissenting opinion did not participate in the original hearing of this cause due to his absence in presiding over a certain Court of Impeachment which was in progress at that time and which lasted for several weeks.

The defendant in error, Southern Bell Telephone Company, filed its motion for a rehearing which was granted and the cause set down for a rehearing. Oral argument has been heard by counsel for the State and the Southern Bell Company and several counsel for the intervenors. The result of this rehearing has been to review the original issues and whether or not there is error in the majority opinion.

I think there is unanimity of opinion that this is a proper case for a declaratory judgment.

With all deference to the majority view I cannot agree that the Act is *not in furtherance of a public purpose.* At the very outset I cannot forbear asking the question: why is this not a valid exercise of the police power of the State by the Legislature; and so adjudged in *Nichol v. Mayor of Nashville, infra?*

In considering whether or not it is for a public purpose we should consider that which gave rise to its enactment. The Congress of the United States had enacted legislation looking to the building of super interstate highways wherein provision was made for participation by the State of Tennessee, (and all other states) in the building of this vast system of public roads. Incidentally the sys-

tem was in aid of national defense. Among other things the "Federal-aid highway projects" provided that the cost of relocation of telephone facilities, as well as other public service corporations, would be shared on a percentage basis.

Thus it is that the sole issue before the Court is whether the General Assembly had the power to provide for reimbursement of public utilities for the cost of relocating their facilities when necessitated by Federal-aid highway construction. Now if the Act is not in furtherance of a public purpose it must be adjudged unconstitutional. It seems to me that it is not unconstitutional under our cases, and also cases from foreign jurisdictions; it is not a lending of the State's credit in aid of this public service corporation in violation of Article 2, Section 31 of the Constitution.

In an early case, *Nichol v. Mayor of Nashville,* 28 Tenn. 252, it was held that a subscription by the City of Nashville to stock in the N. C. & St. L. Railway, which ran at that time from Nashville to Chattanooga, *was for a public purpose.* There are numerous cases to the same effect, which need not be cited at this time. This opinion by Judge Turley in 1848 was a judicial pronouncement as to the public policy of the State with regard to the lending of the State's credit to public service corporations. It was a constitutional exercise of the State's police power. It was cited and followed by this Court in *McConnell v. City of Lebanon,* 203 Tenn. 498, 314 S.W.2d 12, in which it was held that an Act authorizing the issuance of bonds by the Town of Lebanon in aid of a business enterprise (a luggage factory) was for a "public purpose", and not in violation of Article 2, Section 31 of the Consti-

tution. The purpose was to provide employment for a segment of the town's population and to increase the standard of living.

If it is constitutional for a municipality to thus lend financial aid to the building of a railroad (*Nichol v. Mayor of Nashville, supra*) and to issue bonds in aid of a luggage factory, the same to become a debt upon the said municipality, I fail to see why the participation by the State with the Federal Government in building a system of interstate roads should be held invalid on the ground that it is not for a public purpose. Moreover the decided weight of authority, as appears from the highest appellate courts of other jurisdictions, holds that the statute herein assailed is not in violation of Article 2, Section 31 of our Constitution; and these courts were construing statutes similar in all respects to our own as well as constitutional provisions similar in language to that of this State. See Opinion of Justices, N.H., 132 A.2d 613; Opinion of Justices, Me., 132 A.2d 440; *Minneapolis Gas Co. v. Zimmerman,* Minn., 91 N.W.2d 642.

Moreover the building of super highways, express roads and the like has become a matter of public necessity due to the inadequacy of our present highways in every state to accommodate motor vehicular traffic. Every highway is clogged with automobiles, and they are still coming off the assembly lines at the rate of 500,000 per month. Regarding the unquestioned need for the betterment of public roads we take judicial notice of the foregoing facts and also this further fact that this State has been for a number of years engaged in rebuilding, resurfacing and widening socalled "farm to market" roads.

Every opinion of this Court within my knowledge has held either expressly, or by clear implication that the

building of public roads is a public purpose. *Baker v. Hickman County,* 164 Tenn. 294, 47 S.W.2d 1090, 1094. It was there insisted that the statute which authorized the reinbursement of the court for debts incurred in the erection of highways and that the "counties have a claim upon the state for reimbursement" is not in violation of Article 2, Section 31 of the Constitution.

The obligation of the State was "founded in equity and justice". Why should not this principle be recognized in the case at bar? If as it appears now that the Legislature has seen fit to authorize the State Highway Commissioner to cooperate in the Federal-aid highway program the result is that this State is not lending aid, or credit, to a private corporation but is primarily engaged in building a system of public roads, which is, and has always been, regarded as a public purpose.

We know that the building of this vast system of highways by Federal Act will necessitate the relocation of telephone wires and cables from the State's right of way. In other words they must "move over" in aid of the building of highway construction.

At this point I wish to digress to say that the insistence made by counsel that the use of the highway by the telephone company is permissive only, and remain at the sufferance of the State, is illusory. In the beginning it may have been permissive, but it is wholly inequitable and very unjust for the State to encourage the utility to occupy the highway, and expend millions of dollars in perfecting its service for the public and then order them "to get off the road." Under well settled principles of equity the right which in the beginning was permissive has ripened into an easement which is a valid property

right. Moreover they are there by virtue of Code Section 65-2105, and are 'transmitting intelligence.'' It cannot be doubted that the State has a vital interest in their business. Of course, the State could move against them under the police power, but this power could not be exercised arbitrarily. *City of Chattanooga v. Tennessee Electric Power Co.,* 172 Tenn. 524, 112 S.W.2d 385; *Southern Bell Tel. & Tel. Co. v. City of Nashville,* 35 Tenn.App. 207, 243 S.W.2d 617; *Frazier v. East Tennessee Telephone Co.,* 115 Tenn. 416, 90 S.W. 620, 3 L.R.A.,N.S., 323; and *Russell v. Sebastian,* 233 U.S. 195, 34 S.Ct. 517, 58 L.Ed. 912.

The authorities cited on the State's brief sustaining their contention that ''utilities have a non-compensable duty to remove their facilities from publicly owned rights of way when necessary to improve State highways'' is the general rule. But the Legislature may assume this obligation when it is in the furtherance of a public purpose. Moreover, the Legislature is not forbidden by the Constitution to provide for payments which it deems equitable and just. *Baker v. Hickman County, supra;* and *Oehmig v. City of Chattanooga,* 168 Tenn. 618, 80 S.W.2d 83.

Conceding that the contract between the State and Southern Bell is valid and binding, the Legislature is free to release it from its obligations to pay the cost of relocating its facilities under circumstances which are in the public interest, and do not violate the Constitution. The recent case of *Minneapolis Gas Co. v. Zimmerman, supra,* and authorities cited therein, is conclusive of this question as well as all other questions made on this appeal. I am not influenced by the recent opinion by the New Mexico Supreme Court (*State Highway Commission etc. v.*

*Mountain States Tel. & Tel. Co.,* 332 P.2d 1018, because it is in conflict with what I consider the public policy of this State as reflected in *Nichol v. Mayor of Nashville,* and *McConnell v. Lebanon, supra.*

Coming now to the alleged unlawful classification under Section 2 of Chapter 170, Public Acts of 1957, it does not violate the equal protection clause of the Constitution (Article 11, Section 8) because the Legislature is privileged to require the State to assume some specific duties and at the same time exempt it from other duties; it may consent to pay some costs and exempt it from paying other costs. But aside from the foregoing expression, there is a presumption that the classification made in the Act herein assailed *is reasonable. McConnell v. City of Knoxville,* 172 Tenn. 190, 110 S.W.2d 478, 113 A.L.R. 966; *Motlow v. State,* 125 Tenn. 547, 145 S.W. 177, L.R.A. 1916F, 177; and *Sun Coal Co. v. State,* 157 Tenn. 522, 11 S.W.2d 893.

Finally my view of the question of alleged lending of the State's credit to Southern Bell, I feel that in truth and in fact the State is giving practical and valuable aid to highway construction. By way of illustration, if the cost of relocating these facilities should be ten million dollars, there will be refunded by the United States Government the sum of nine million dollars. The balance of one million dollars indebtedness incurred by the State should be considered as its contribution in that amount to the building of the Federal-aid highway system. The traveling public of this State will have the benefit of this improved system of highways at comparative nominal cost, or the cost of only ten (10%) per cent of the overall cost of the project. It should not be thought of as a

donation to the telephone company because it is an expenditure for State highway construction, which is clearly in the public interest.

Furthermore I cannot agree with the majority opinion that the statute confers upon this utility benefits in violation of constitutional inhibitions (Article 2, Section 31). The Federal ''Reimbursement Act'' provides that the ''Cost of relocation'' means ''the entire amount paid by such utility properly attributable to such relocation after deducting therefrom any increase in the value of the new facility and any salvage value derived from the old facility.'' 23 U.S.C.A. sec. 123(c). By the very language of the Act the right to any reimbursement is confined to *non-betterment cost*. As the Supreme Court of Minnesota has so clearly pointed out, ''The reimbursement merely restores plaintiff utility to the same position it was prior to the relocation of its facilities.'' See *Minneapolis Gas Co. v. Zimmerman, supra* [91 N.W.2d 652]. The foregoing statement cannot be successfully controverted, and it seems to me that it is conclusive of the proposition that the State is not lending its credit in violation of the Constitution.

The majority opinion of this Court, which strikes down Chapter 170 of the Public Acts of 1957, deprives this State of any benefits under the Federal-aid highway project and at the same time the citizens and tax payers of Tennessee are onerated with a tax burden levied by the Federal Government for building super highways in other states. The Legislature must have foreseen the foregoing injurious consequences in the event legislation was not enacted to guard against such an injustice.

Of course, we cannot be concerned as to whether a statute is wise or unwise. But it is not improper to

consider the purpose of an act which shows on its face that it was not intended to confer a private benefit, i. e. the lending of the State's credit to a private corporation, to the manifest prejudice of the public interest.

Under universal canons of statutory construction every act is presumed to be constitutional. Indeed it is the duty of the courts to resolve every doubt in favor of the act and sustain it if it is possible to do so.

For the foregoing reasons I respectfully dissent from the majority opinion.

TOMLINSON, JUSTICE (dissenting).

In as much as the majority, after granting a rehearing, has adhered to its previous conclusions, I feel that I should herewith supplement the dissent which I wrote when the decision of the majority was first announced.

In my original dissent, I called attention to the fact that the Supreme Court of Maine and New Hampshire had adjudged a statute equivalent to our Chapter 170, Public Acts of 1957, not to be in violation of their respective constitutional provisions, forbidding the lending of the State's credit "in aid of any person, association, company, corporation or municipality". An identical adjudication on July 16, 1958 was announced by the Supreme Court of Minnesota in *Minneapolis Gas Co. v. Zimmerman.* The opinion has not yet appeared in the published reports.

There was also furnished to the members of this Court copies of opinions likewise so adjudging by Courts of original jurisdiction as follows:—"*Idaho v. Idaho Power Company, et al,* decided July 3, 1958, District Court; *Texas v. City of Austin, et al,* decided August 14, 1958,

District Court; *State Highway Commissioner of New Mexico v. Mountain State Telephone Co. et al,* decided January 14, 1958, District Court". Subsequently the New Mexico Supreme Court reversed, basing its conclusions heavily upon the majority opinion of our Court in the case at bar.

These decisions are worthy of consideration, I think, at least in connection with the controlling question of whether in its enactment of this statute, that reimbursement to the public utilities by the State for the "nonbetterment" expenses incurred in moving these facilities is founded on equity and justice and, therefore, not in contravention of Article 2, Section 31 under the holding of our own decisions in *Baker v. Hickman County,* 164 Tenn. 294, 308-309, 47 S.W.2d 1090, and *Oehmig v. City of Chattanooga,* 168 Tenn. 618, 624, 80 S.W.2d 83.

The majority opinion cites the Kentucky case therein mentioned. But in so doing, it was, in my opinion, begging the question. The Kentucky Court was not passing upon the constitutionality of a statute tested by a non lending of credit clause thereof. It was simply declaring the obligation of the utilities under the common law to move their facilities when their presence on the highway proved an obstruction in the rebuilding, etc. thereof. No one gainsays the soundness of such holding. But that has no bearing on the question here, towit, the constitutionality of our Chapter 170, Acts of 1957. I am informed that the Kentucky Legislature subsequently enacted a re-imbursement statute the equivalent of our Chapter 170. But, I have not checked this since it, standing alone, is not very material to our question.

The basis of the conclusion of the majority opinion is that the expenditure for the moving of the facilities of

the utilities is not for a state purpose because, so the majority says, "the primary purpose served by the expenditure is for the convenience and benefit of the utilities". In my opinion, that statement cannot successfully withstand analysis.

These various utilities now have their facilities on the rights-of-way of roads and streets by virtue of statutes and ordinances. By way of illustration, the telephone companies are there by virtue of Code Section 65-2105 because they are "transmitting intelligence". The State is most certainly interested in the rapid transmission of intelligence, news, etc. to its citizens. These benefits to the state, as observed in my original dissenting opinion, are noted in detail in *Frazier v. East Tennessee Telephone Co.*, 115 Tenn. 416, 424, 425, 90 S.W. 620, 3 L.R.A., N.S., 323. The Minnesota case especially so comments on this particular benefit to the State, viz.:

"Clearly since the Cater decision in 1895 [*Cater v. Northwestern Tel. Exchange Co.*, 60 Minn. 539, 63 N.W. 111, 28 L.R.A. 310], Minnesota has been definitely committed to the view that the use of rights-of-way by utilities for locating their facilities is one of the proper and primary purposes for which highways are designed even though their principal use is for travel and the transportation of persons and property. Furthermore, the import of that decision is a clear recognition that the use of highway rights-of-way for the transmission of public intelligence and public utility services confers important and direct benefits upon the public and that such use is not solely for the benefit and convenience of the utilities. The soundness of the view that the placing of utility facilities upon a right-of-way is one of the

proper uses of a highway benefiting the public is emphasized by the fact that convenience and economy result therefrom to utility users, who are usually located near highways, and by the further fact that, it is in the interest of the public welfare—in the view of our ever-increasing population—to make full and efficient use of the land surface occupied by public roads.''

Moreover, the utilities, having thus acquired by legislative enactment and ordinance the right to place its facilities upon the highways and streets, have thereby acquired ''an easement, and as such is a property right * * * entitled to all of the constitutionl protection afforded other property rights and contracts''. *City of Chattanooga v. Tennessee Electric Power Co.,* 172 Tenn. 524, 537, 112 S.W.2d 385, 390.

Therefore, no citation to a decision of Court is necessary to verify the statement that a State has not the authority to arbitrarily order such utility to remove its facilities from such right-of-way. Its right to require such removal is based upon its police power when such removal becomes necessary in the rebuilding, enlarging, etc. of the public highway, or for other similar reason. To assert, therefore, that the removal of these facilities of the utilities from the right-of-way for such a reason is not for a state purpose is, in my opinion, to assert that which does not square with every day logic.

Nor can I agree with the statement in the majority opinion that ''the primary purpose'' of such moving of the facilities of the utility ''is for the convenience and benefit of the utilities''. To ask in what manner they are convenienced is, *per se,* to suggest the answer that they

are not convenienced in any manner by being required to move their facilities.

And as to the alleged "benefit", to say that the utilities are benefited by such removal is to ignore the fact that reimbursement to the utility for the removal of its facilities is confined to such expense as is "properly attributable to such relocation after deducting therefrom any increase in the value of *the new facility and any salvage value derived from the old facility*". So it is that the "utilities' right to reimbursement is limited to *non betterment costs*". (Emphasis supplied.) How, then, can the utility be benefited by being required to remove its facilities from the right-of-way? It has gained absolutely nothing.

By implication the original majority opinion seems to recognize it to be a fact that the constitutional prohibition against lending the state's credit would not be violated in this case if the statute were based upon the fact that it is in accord with justice and equity. I say this because the majority opinion, after reciting that the New York case of *Oswego S. R. v. State,* 226 N.Y. 351, 124 N.E. 8, was correct in upholding the statute there involved because "the facts in the Oswego case showed that equity did demand that the state step in and do equity", then asserts that "we have no question of equity in the present case", meaning the case at bar. I am unable to draw any distinction between the case at bar and the Oswego case, *supra.*

As noted in my original dissent, the United States Congress thought that equity and justice required that the utilities be reimbursed to the extent of their non-betterment, costs in the removal of their facilities from these

rights-of-way. It thought that this "program on an unprecedented scale" in the building of interstate highways subjected these utilities to "a tremendously different treatment" from that ever theretofore contemplated, and that the sum total of such costs might be beyond "the reach of the utilities' ability to fund the same, whether the utility was publicly, privately or cooperatively owned". The Courts of every State, except ours, and New Mexico, which followed our opinion, which have passed upon the question have been of the opinion that there is a rational basis in justice and equity for the reimbursement to the utilities of such non-betterment costs.

If all this were not enough to persuade the majority of this Court that regardless of individual views, there is a justification for thinking that there is a rational basis in justice and equity for the enactment by the Legislature of Chapter 170, as so many Courts and legislative bodies seem to think, then, in addition, this majority, it seems to me, must nevertheless take judicial knowledge of the fact that the tremendous costs of such removal of its facilities upon so gigantic a scale threatens many of our weaker utilities with bankruptcy if it has to pay this never before contemplated bill, and will place a never contemplated burden upon the financially stronger utilities who must pay the costs thereon in materially increased rates to those who are compelled to use its services, while such rate users in the other states except New Mexico are relieved of this additional burden.

All this, it seems to me, compels the conclusion that at least this is a justification for concluding that there is a rational basis in justice and equity for the enactment of

this statute reimbursing the utilities to the extent of non-betterment costs, regardless of whether we individually disagree with that conclusion. And, it being a reasonable conclusion that there exists a rational basis in justice and equity for such reimbursement, unless a great lot of Courts and legislative bodies are intellectually arbitrary in their thinking, this Court, in my opinion, is trespassing upon the prerogatives of the legislative branch of our government in striking down such statute because it does not agree with the view of the legislature that it is just and equitable to reimburse these utilities.

I am persuaded that the majority, in reaching its conclusion, was unconsciously, at least, influenced by assuming in its original opinion that:

"* * * it was necessary for the State to appropriate and raise large sums of money, necessitating the enactment of Chapter 264, Public Acts of 1957, authorizing the State Funding Board to tissue bonds in the amount not exceeding $30,000,000.00; that the department has estimated that the cost of relocating utility facilities in connection with interstate highway projects in Tennessee will amount to $15,370,000.00, which is more than one half of the amount which the Legislature authorized the State to borrow for highway purposes under said Chapter 264, Public Acts of 1957".

The majority of my brothers must have then overlooked the fact that if our Chapter 170 is adjudged constitutional with the result that the State will, to the extent of the non-betterment costs, reimburse the utilities for the moving of their facilities, that then the United States Government will pay, or reimburse the State, to the extent of 90% of such costs. That is, if the costs of such moving is $15,-

370,000, as stated in the original opinion of the majority, then 90% thereof will be paid by the United States Government, and 10% by the State. The result would be that the entire costs to the State would be about one and one-half million dollars instead of $15,370,000.

But with the adjudging of our Chapter 170 unconstitutional, the users of the utilities in Tennessee will, in the end, be compelled to pay in increased rates the entire $15,370,000, except as to such of the utilities as are forced out of business by reason of being required to pay such costs.

But still another burden will be added to the rate payers in Tennessee,—and they compose about all of our people. It is summed up in the Pennslyvania case of *Department of Highway v. Pennslyvania P. U. Comm.*, 185 Pa.Super. 1, 136 A.2d 473, 477, as follows:

"* * * Thus, if state 'A' receives from the federal government 90% of the cost of other utility relocations of inter-state highways because the policy of that state is to bear this cost, while state 'B' receives nothing from the federal government for utility relocations because its policy is not to bear this cost, the citizens of state 'B' will pay on their utility bills for utility relocations in their state, and will also pay in their federal gasoline tax for a part of the cost of relocating utilities in state 'A'."

This, in my opinion, is another reason that Chapter 170 of the Acts of 1957 has a basis in justice and equity and, therefore, for this reason, if for no other, is not contrary to Article 2, Section 31 forbidding this State from lending its credit in aid of any person, association, company, corporation or municipality. Such a situation is not

234

the lending of its credit under our decisions hereinbefore mentioned:—*Baker v. Hickman County* and *Oehmig v. City of Chattanooga, supra.* There is, I think, no way to avoid the conclusion that the majority opinion simply overrules *Baker v. Hickman County* and *Oehmig v. City of Chattanooga.*